Judge Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR-09-0084-MJP |
| Plaintiff, | ) | GOVERNMENT'S SENTENCING MEMORANDUM RE: ALLA SOBOL |
| v. | ) | |
| ALLA SOBOL, a/k/a ALLA PYATETSKAY, | ) | [Hearing Date: December 4, 2009] |
| Defendant. | ) | |

## I.   INTRODUCTION

Defendant Alla Sobol comes before the Court having pled guilty to conspiring to commit bank fraud, mail fraud, and wire fraud in violation of Title 18, United States Code, Section 371.  Defendant Sobol's five co-conspirators, Vladislav Baydovskiy, Viktor Kobzar, Camie Byron, David Sobol and Sandra Thorpe all entered guilty pleas to the same charge.  A seventh defendant, Donata Baydovskiy, entered a guilty plea to making a false statement in a matter occurring before the Department of Housing and Urban Development.  The false statement was made during the course of the charged conspiracy.

The charged conspiracy arose from a scheme to defraud lending institutions into making mortgage secured purchase money and refinance loans.  An additional aspect of the scheme included defrauding otherwise unqualified prospective borrowers to secure purchase money loans based on false and fraudulent representations.  The defendants profited from the scheme by charging excessive fees and diverting some of the fraudulently obtained loan

1  proceeds to themselves.  The scheme succeeded in large part due to the defendants'

2  ownership and operation of both a mortgage loan brokerage business (Kobay and

3  Nationwide) and an escrow operation (Emerald City Escrow).  Defendant Alla Sobol's role

4  in the charged scheme included operating Nationwide under her mortgage brokers license

5  and participating in efforts to form and operate Emerald City Escrow under the managerial

6  supervision of her husband and co-defendant, David Sobol.  In addition, her participation

7  included preparing and submitting false documentation for purchase money loans used to

8  acquire properties in her own name.

## II.  FACTUAL BACKGROUND

10       The facts and circumstances underlying the offense conduct for which Ms. Sobol pled

11  guilty are summarized in the Plea Agreement and Presentence Report. (See Plea Agreement,

12  pp. 6-9; P.S.R. ¶¶ 14-34).  The first section of the agreed statement in the Plea Agreement is

13  repeated below for the court's convenience.

14       Kobay Financial Corporation (Kobay) was a Washington State corporation established

15  by defendants Vladislav Baydovskiy and Viktor Kobzar on or about September 15, 2000.

16  Kobay was engaged in the business of originating mortgage loans, and packaging and

17  submitting loan applications and related documents for funding to lenders.

18       Nationwide Home Lending, LLC (Nationwide) was a Washington State limited

19  liability company established by defendant Vladislav Baydovskiy on or about November 8,

20  2005.  Nationwide was also engaged in the business of originating mortgage loans, and

21  packaging and submitting loan applications and related documents for funding to lenders.

22  The Defendant was substituted as owner of Nationwide in September 2006.  Nationwide

23  commenced operations in January 2007.  The Defendant began personally originating

24  mortgage loans and packaging loan applications under Nationwide's business name in

25  February 2007.  Nationwide ceased conducting business operations in October 2008.

26       Emerald City Escrow, LLC (Emerald City) was a Washington State limited liability

27  company established by defendants David Sobol and Donata Baydovskiy, and an un-named

28  individual, on or about September 15, 2005.  Emerald City was engaged in the business of

Government's Sentencing Memorandum
Sobol, Alla
Baydovskiy et al., CR-09-0084-MJP) - 2

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  acting as an intermediary to facilitate the purchase and sale of real property.  Emerald City,

2  through the actions of its employees and principals, prepared, obtained and delivered written

3  instruments, money, evidence of title, and other things of value to complete or close real

4  property transactions.

5      The Defendant was a director, officer and managing member of Nationwide.  The

6  Defendant was also a registered mortgage broker in the State of Washington.  Beginning in

7  early 2007, Defendant and her co-conspirators began using the Nationwide entity to conduct

8  their mortgage brokerage business operations.

9      During the period of the Defendant's ownership of Nationwide, in the Western

10 District of Washington and elsewhere, the Defendant and her co-conspirators willfully and

11 knowingly conspired, combined, confederated and agreed among themselves, and with other

12 persons, to defraud financial institutions by, among other things: (a) locating residential real

13 properties that were available for purchase and recruiting straw buyers to participate in

14 purchasing the properties; (b) falsely inflating the value of the properties, and (c) submitting

15 false and fraudulent mortgage loan applications, title documentation, and related documents

16 to financial institutions, thereby causing lenders to make loans.

17     It was part of the conspiracy that the Defendant or her co-conspirators located

18 residential properties available for purchase and recruited individuals to act as buyers of the

19 located properties.  These individuals, otherwise known as "straw buyers," would allow their

20 identities and credit to be used by the Defendant or her co-conspirators to purchase the

21 properties.  In most cases, the straw buyers had no intention of permanently owning or

22 occupying the properties.  In many cases, the Defendant or her co-conspirators paid straw

23 buyers for participating in purchasing selected properties and told straw buyers that they

24 would pay for expenses associated with ownership, including mortgage payments, property

25 taxes, and utilities during their titular ownership of the property.

26     The Defendant or her co-conspirators would prepare, or cause others to prepare, a

27 Uniform Residential Loan Application ("Loan Application") to facilitate the scheme to

28 defraud.  The Loan Application, commonly referred to as a mortgage loan application, or

Government's Sentencing Memorandum
Sobol, Alla
Baydovskiy et al., CR-09-0084-MJP - 3

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1 Form 1003, is a universally used mortgage loan application developed by federal government

2 agencies and utilized by financial institutions and other lenders in the mortgage loan approval

3 process.  The Loan Application requires prospective borrowers to submit a complete and

4 accurate financial history, including employment information, monthly income, assets and

5 liabilities, details of the residential real estate transaction, and whether the property will be

6 used as the borrower's primary residence.  The Defendant and her co-conspirators, and others

7 acting on their behalf, caused the Loan Applications for the straw buyers to be prepared.

8 Some of these Loan Applications contained fraudulent representations related to gross

9 monthly income, employment status, assets and liabilities, and whether the property would be

10 used as the primary residence.  The Defendant and her co-conspirators then submitted, or

11 caused to be submitted, the false and fraudulent Loan Applications, together with the false

12 and fraudulent supporting documentation related to income, assets, liabilities, employment

13 status, and tax information to prospective lenders to secure mortgage backed financing.

14 Some of the lenders were financial institutions as defined in Title 18, United States Code,

15 Section 20.

16      Using escrow services provided by Emerald City Escrow, the Defendant or her co-

17 conspirators created, and caused others to create, false HUD-1 Settlement Statements.

18 HUD-1 Statements are standard forms used to facilitate the closing of residential real estate

19 purchase and sale transactions.  They are used to identify and allocate expenditures and

20 payments associated with the transaction.  Lending institutions rely on the accuracy of

21 HUD-1 Statements to ensure loan proceeds are applied appropriately to protect the lender's

22 security interest in the purchased property.

23      The Defendant or her co-conspirators, and others acting under their direction,

24 prepared and submitted false HUD-1 Statements to lending institutions.  False and fraudulent

25 HUD-1 Statements were used to conceal the underlying purchase and sale transaction in

26 which the negotiated sale price was often less than that represented on the falsified

27 Statement.  The Defendant or her co-conspirators prepared multiple HUD-1 Statements in an

28

Government's Sentencing Memorandum
Sobol, Alla
Baydovskiy et al., CR-09-0084-MJP) - 4

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  effort to conceal from purchasers and lenders the true nature of expenditures and payments
2  associated with the purchase and sale transaction.
3      The Defendant or her co-conspirators used false and fraudulent HUD-1 Statements to
4  facilitate the diversion of a significant portion of the loan proceeds from escrow accounts for
5  their personal benefit.  In some cases, a portion of the diverted loan proceeds were used to
6  make payments on fraudulently obtained loans to delay defaulting on the obligation and
7  facilitate further fraud by using the acquired property for subsequent fraudulent transactions.

## III.  ADVISORY GUIDELINE CALCULATION

9      The parties' plea agreement does not include an agreed advisory guideline calculation.
10  Based on the offense characteristics, the government contends the following calculation is
11  accurate:

12      a.     A base offense level of six (6), pursuant to USSG § 2B1.1.(a)(2)   ........   6

13      b.     An eighteen (18) level increase pursuant to USSG § 2B1.1.(b)(1)(D)
             because a reasonable estimation of the actual losses sustained by
14               the victims of the mortgage fraud scheme was more than
             $2.5 million but not more than $7.0   .......................................   18

15      c.     A two (2) level increase pursuant to USSG § 2B1.1.(b)(2)(A) because
16               the offense involved 10 or more victims....................................   2

17      d.     A two (2) level increase pursuant to USSG § 2B1.1 (b)(9) because
             the offense otherwise involved sophisticated means............................   2

18
19      e.     A four (4) level increase pursuant to USSG § 3B1.1.(a) because the
             defendant was an organizer or leader of the scheme to defraud .............   4

20      e.     Acceptance of Responsibility ..................................................   [3]

21            TOTAL ADJUSTED OFFENSE LEVEL  .............................   29

22  This proposed calculation differs from that offered by the Probation Office.  According to the
23  Probation Office, the two level enhancement pursuant to USSG § 2B1.1.(b)(9) is not
24  applicable because the scheme perpetrated by Defendant Sobol and her co-conspirators did
25  not otherwise involve sophisticated means.
26      The resulting advisory guideline range, based on the total adjusted offense level of 29
27  would be 87 to 108 months applying a criminal history category of I.  The five year statutory
28

Government's Sentencing Memorandum
Sobol, Alla
Baydovskiy et al., CR-09-0084-MJP) - 5

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  maximum sentence under the charged and agreed violation of 18 U.S.C. § 371 effectively

2  caps the advisory guideline range at 60 months.

3      **A.**    **A Reasonable Estimate Of The Loss For Guidelines Purposes Is More Than $2.5 Million But Not More Than $7.0 Million**

4      The government and counsel for defendants Camie Byron and David Sobol have

5  stipulated that the government can establish an estimated loss amount attributable to the

6  admitted fraud for purposes of calculating the applicable offense level of between $2.5

7  million and $7.0 million.  It is anticipated that counsel for defendant Alla Sobol will join in

8  that stipulation.  The stipulation was sought in the interest of avoiding a potentially

9  protracted evidentiary hearing for the limited purpose of establishing a reasonable estimate of

10  the loss.[1]  Recognizing that the court must make its own loss determination, the government

11  offers the following legal points.

12      Absent the stipulation, the government anticipates that the defendants will each

13  contest the loss amount as preliminarily calculated by the Probation Office and the

14  government.  While the government readily concedes that establishing a precise loss amount

15  may be problematic, such precision is not required.  *See, e.g. United States v. Showalter,* 596

16  F.3d 1150, 1161 (9th Cir. 2009)("a district court has a number of permissible methods for

17  determining monetary loss, and 'need not make its loss calculation with absolute precision.'")

18  citing *United States v. Zolp,* 479 F.3d 715, 719; *United States v. Garro,* 517 F.3d 1163, 1167

19  (9th Cir. 2008)("loss need not be determined with precision, but need only be a reasonable

20  estimate...given the available information); *United States v. Miller*, 188 F.3d 1312, 1317 (per

21  curiam) (11th Cir. 1999) (explaining that courts may reasonably estimate the amount of loss

22  because "often the amount of loss caused by fraud is difficult to determine accurately.").  As

23  discussed below, the government's proffered loss amount attributable to the charged and

24  admitted scheme is a reasonable estimate supported by reliable and sufficient evidence.

25

---

26      [1] The stipulation specifically provides that it shall not apply to the judicial determination of

27  restitution in this case. The parties are free to advocate for any amount of restitution, wholly independent of the stipulated loss range.  In addition, evidentiary submittals offered to substantiate the agreed loss estimate for guidelines purposes are not to be cited to the court for purposes of challenging any proffered

28  claim for restitution.

Government's Sentencing Memorandum
Sobol, Alla
Baydovskiy et al., CR-09-0084-MJP) - 6

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1

**1.    The Government's Proposed Methodology Is Consistent With The Guidelines And Ninth Circuit Authority**

2

U.S.S.G. § 2B1.1(b)(1) provides for an increase in the base offense level based on the

3

amount of the loss.  Application Note 3(A) defines loss as "the greater of actual loss or

4

intended loss that resulted from the offense."  "'Actual loss' means the reasonably foreseeable

5

pecuniary harm that resulted from the offense." Application Note 3(A)(I). "'Intended loss' . . .

6

means the pecuniary harm that was intended to result from the offense . . . and . . . includes

7

intended pecuniary harm that would have been impossible or unlikely to occur . . . ."

8

Application Note 3(A)(ii).

9

As to determining the loss, "[t]he court need only make a reasonable estimate of the

10

loss." Application Note 3(C).  *See also United States v. Lutz*, 154 F.3d 581, 590 (6th Cir.

11

1998) ("In determining the loss for sentencing purposes, a district court need only make a

12

reasonable estimate of the loss, and this court reviews for clear error and reverses the

13

valuation only if it is outside the realm of permissible computations.") (citation omitted).[2]

14

In the case of collateral pledged or provided by the defendant, a credit must be applied

15

based on the fair market value or disposition amount of the collateral at the time of

16

sentencing. Application Note 3(E)(ii).  Notably, this basis for reducing the amount of the loss

17

turns on the defendant's own efforts or own collateral, not the efforts or collateral of a third

18

party.

19

Courts have approved a common methodology for assessing a reasonable estimation

20

of loss in cases with mortgage fraud schemes employing practices similar to those used in

21

this case.  This methodology properly holds the mortgage fraudster responsible for the loan

22

money received as a result of the fraud, but appropriately deducts from the loss amount the

23

fair market value of the collateral, as suggested by Application Note 3(E)(ii) to U.S.S.G.

24

25

26

27

28

---

[2] It is important to note that the loss calculations necessary to determine restitution under § 3663, and the loss determination necessary for guidelines purposes under USSG § 2B1.1 are distinct.  The purpose of restitution is restorative, to compensate the victims of the offense conduct for harm caused by the defendants.

Government's Sentencing Memorandum
Sobol, Alla
Baydovskiy et al., CR-09-0084-MJP) - 7

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  §2B1.1. This is the methodology recommended by the government and employed by the

2  Presentence Report to determine actual loss.

3       Subtracting the value of collateral at the time of sentencing from the mortgage loan

4  proceeds to determine actual loss to lenders was employed the Eighth Circuit in *United States*

5  *v. Parish*, 565 F.3d 528 (8th Cir. 2009) in determining loss for sentencing purposes.

6  According to the court in *Parish*:

7  > Pursuant to U.S.S.G. § 2B1.1, the equation used to calculate actual loss to the lenders
> is the amount of the fraudulently obtained mortgage loans minus any payments made

8  > on the loan principal and the value of the collateral at the time of sentencing.  *See*
> U.S.S.G. § 2B1.1 app. n. 3 (E)(I) and (E)(ii).  The government submitted evidence to

9  > the district court that the defendants fraudulently obtained 195 mortgage loans from
> twenty-four separate lending institutions, resulting in defendants receiving

10  > approximately $85 million in loan proceeds.  Therefore, we take the amount of the
> loan proceeds-$85,020,128-and subtract the value of the 195 homes built by PMDC

11  > and used as collateral.

12  *Id*. at 535.  The government in *Parish* provided the district court with a comparative analysis

13  of the market value of comparable homes to those built by the defendant.  This value was

14  multiplied by the number of properties for which fraudulent loans had been obtained to

15  determine an approximate value of the collateral at the time of sentencing.

16       The First Circuit recently endorsed this approach of "first determin[ing] the total

17  amount of the loan issued for each of the flipped properties, and subtract[ing] from that

18  number the considerably lower amount the land-flippers paid for the piece of property in

19  question . . . [so that the] latter quantity serve[s] as a proxy for the true amount of the security

20  the lender held on the property."  *United States v. Innarelli*, 524 F.3d 286, 290-91 (1st Cir.

21  2008), *cert. denied*, 129 S.Ct 350 (2008).

22       The Ninth Circuit in *United States v. Allen*, 88 F.3d 765 (1996) presented useful

23  guidance for this court to follow in determining a reasonable estimation of loss.  Citing

24  decisions from other circuits, the court in *Allen* held that "actual loss" must take into account

25  the amount recovered or reasonably anticipated to be recovered from collateral that secured

26  the loan, and loan payments made prior to default.  *Id*. at 770 citing *United States v.*

27  *Rothberg*, 954 F.2d 217, 219 (4th Cir. 1992) *United States v. Baum*, 974 F.2d 496, 499 (4th

28  Cir. 1992); *United States v. Smith*, 951 F.2d at 1167-68.

Government's Sentencing Memorandum
Sobol, Alla
Baydovskiy et al., CR-09-0084-MJP) - 8

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   The district court in *Allen* found the minimum loss to be $70,255.75.  Based on the

2   record below, the court determined that this figure was derived from testimony finding the

3   gross loan value totaled $170,412.68; the proceeds realized from repossession and resale of

4   properties equaled $100,156.93; and the loan payments made prior to default totaled

5   $54,989.15.  Finding that the district court properly subtracted the resale proceeds from the

6   gross loan value, the court affirmed the loss determination of $70,255.75.

7   The defendant in *Allen* argued that the district court should also have subtracted the

8   $54,989.15 of loan payments made prior to default when calculating the actual loss, thereby

9   reducing the actual loss to $15,266.60.  Denying this argument, the court noted that the loan

10  payments had been credited by the bank towards interest, not principal.  Citing decisions

11  from other circuits approving of the inclusion of accrued interest as part of the actual loss

12  calculation, the court in *Allen* noted that the district court was not asked to include accrued

13  interest as part of the actual loss calculation.  88 F.3d at 771, citing *United States v. Gilberg*,

14  75 F.3d 15, 19 (1st Cir. 1996)(accrued interest included in the loss calculation under §

15  2F1.1); *United States v. Henderson*, 19 F.3d 917, 928 (5th Cir.)(same), *cert. denied*, 130 L.

16  Ed. 2d 137, 115 S. Ct. 207 (1994); *United States v. Jones*, 933 F.2d 353, 354-55 (6th Cir.

17  1991)(same); *United States v. Allender*, 62 F.3d 909, 917 (7th Cir. 1995)(same), *cert. denied*,

18  133 L. Ed. 2d 732, 116 S. Ct. 781 (1996); *United States v. Lowder*, 5 F.3d 467, 471 (10th Cir.

19  1993)(same); *contra United States v. Hoyle*, 33 F.3d 415, 419 (4th Cir. 1994)(loss calculation

20  under § 2F1.1 should not include accrued interest), *cert. denied*, 130 L. Ed. 2d 892, 115 S.

21  Ct. 949 (1995).  The court found that had the district court included the accrued interest, then

22  interest payments made prior to default would have been taken into account. See U.S.S.G. §

23  2F1.1 comment. (n.7(b)) ("the loss is the amount of the loan not repaid. . ."); *Rothberg*, 954

24  F.2d at 219; *Baum*, 974 F.2d at 499; *Smith*, 951 F.2d at 1167-68. The district court in *Allen*

25  used only the loan principal to calculate the "amount of the loan"; it did not consider the

26  accrued interest.  Using this approach, payments made towards interest could not be

27  considered as repayments made on the loan.  The court affirmed the district court's exclusion

28  of the $ 54,989.15 in interest payments from the loss calculation.

Government's Sentencing Memorandum
Sobol, Alla
Baydovskiy et al., CR-09-0084-MJP - 9

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Similarly, the court in *Allen* affirmed the district court's refusal to consider the interest proceeds from the non-defaulting loans.  The defendant argued that the court should have considered the interest income from these loans claiming it was inconsistent to aggregate losses from defaulting loans and ignore gains from non-defaulting loans.  The court affirmed the district court's rejection of  this argument.  Finding the calculations consistent, the court noted that the district court did not include as part of the loss the interest income the bank lost as a result of default, and therefore did not set off against the loss the interest income received from non-defaulting loans.  Contrary to defendant's argument, the court found it was the lost interest income associated with the defaulting loans, not the amount of the unpaid principal, that is the counterpart of the interest income derived from the non-defaulting loans. The interest income lost on the defaulting loans was not included. Therefore, interest income from the non-defaulting loans should not have been included either.

Finally, in a determination applicable to this case, the court in *Allen* ruled that the district court also correctly refused to include payments made on current outstanding loans. For these loans, the risk of default on the then current loans was offset by the current and prospective amount of income to be collected.  Recognizing the difficulty of accurately estimating the default risk and factoring it into the loss calculation, the court concluded that any prospective income should not be considered.  88 F.3d at 771, citing *Smith*, 951 F.2d at 1169 and *United States v. Hughes*, 775 F. Supp. 348, 351 (E.D. Cal. 1991).  Finding that the district court's determination that future losses and profits were too speculative to consider was not clearly erroneous, the court in *Allen* concluded that it was inappropriate to consider the loan payments made on the outstanding current loans.  *Id.*

In summary, the guideline application notes, as applied by the courts, advocate applying the following methodology to the loss determination in this case:

- Aggregate the gross loan value of all loans procured by the defendants during the pendency of the charged scheme provided the identified loans were obtained using one or more fraudulent representations;

Government's Sentencing Memorandum
Sobol, Alla
Baydovskiy et al., CR-09-0084-MJP) - 10

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

- Deduct the gross loan value of all loans for which the lender or loan servicing company is not currently reporting a loss or the borrower is not in default;

- Deduct the fair market value of the pledged collateral (measured at or about the time of sentencing) from the aggregate value of all fraudulently obtained loans that were either foreclosed or are presently in default status; and

- Do not include as part of the loss the interest income the lender lost as a result of default and do not set off against the loss the interest income received from non-defaulting loans.

2. **There Is Sufficient and Reliable Information To Support A Reasonable Loss Estimation Of More Than $2.5 Million But Less Than $7.0 Million**

The government offers the attached Declaration of James C. Vach as evidence supportive of a reasonable loss estimation of more than $2.5 million but likely less than $7.0 attributable to the charged and admitted mortgage fraud scheme. As noted in the Declaration, Mr. Vach is a Consumer Fraud Analyst employed by the United States Postal Inspection Service. He has actively contributed to the government's investigation and prosecution of this mortgage fraud scheme. One of the tasks he undertook was to contact all of the lenders identified by the government as extending one of seventy-three (73) loans known to have been obtained using fraudulent representations. The fraudulently obtained loans were listed in a document entitled "Fraud Book." The Book, a copy of which is attached to the Declaration as Exhibit A, formed the basis of the charged scheme and was provided in discovery to all the defendants.

Mr. Vach's declaration details his efforts to identify the current lender or loan servicing company for each of the identified loans. Vach Dec. at ¶ 4. Each identified lender or servicing company was asked to provide current information regarding the loan status. For those loans identified as being in default status, the lender or servicing company was asked to provide the current fair market value of the property. Applying the methodology discussed in the preceding section, Mr. Vach assembled the requested information in a second document entitled "Losses from Lenders." The loss document, a copy of which is

Government's Sentencing Memorandum
Sobol, Alla
Baydovskiy et al., CR-09-0084-MJP) - 11

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  attached to the Declaration as Exhibit B, was provided to all of the defendants.  In addition,

2  all of the defendants were given copies of documentation received from the lenders and

3  servicing companies to substantiate the losses.  The government is unaware of any similar

4  efforts being undertaken by the defendants, either collectively or individually.

5        As candidly admitted above, the government's proffered loss estimate is not precise.

6  The guidelines and applicable case law do not, however, require precision.  They merely

7  require a reasonable estimation.

8  **B.      The Scheme To Defraud Was Devised And Implemented Using Sophisticated Means**

9        The government disagrees with the Probation Office's decision not to apply the two

10 level enhancement authorized by U.S.S.G. §2B1.1(b)(9) for offenses otherwise involving

11 sophisticated means.  Application Note 8(C) to Section 2B1.1 states that "'sophisticated

12 means' means especially complex or especially intricate offense conduct pertaining to the

13 execution or concealment of an offense."

14       Numerous courts have affirmed the district court's application of this enhancement in

15 the context of similar mortgage fraud schemes.  *United States v. Septon*, 557 F.3d 934,

16 935-36, 937 (8th Cir. 2009) (defendant directed his employees to submit fraudulent

17 documents to lenders concealing the fact that defendant was providing bridge loans to buyers

18 for their down payments; that defendant used his businesses to act as sham employers for

19 borrowers in order to falsely verify and the nature and sources of income; that loan

20 applications falsely inflated borrowers' assets and income; and contained false tax returns,

21 pay stubs, gift letters, bank statements, and bank notes); *United States v. Dinnall*, 2009 WL

22 405365 (11th Cir. 2009) (unpublished) (defendant created and submitted to lenders

23 fraudulent employment and earnings statements in eleven loan applications for borrowers,

24 including fraudulent forms to verify employment, W-2 statements, payroll stubs, bank

25 account statements, and other information, and who listed the phone numbers of friends and

26 relatives on the employment records and recruited those individuals to verify the false

27 information); *United States v. Wright*, 496 F.3d 371, 377-78 (5th Cir. 2007) (defendant used

28

Government's Sentencing Memorandum
Sobol, Alla
Baydovskiy et al., CR-09-0084-MJP) - 12

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

his own funds to purchase cashier's checks for closing costs in the names of the loan

applicants, made copies of the same checks which were forwarded to the lenders, then

deposited the same cashier's checks into his account); *United States v. Small*, 210 Fed. Appx.

776 (10th Cir. 2006) (unpublished) (defendant employed shell corporations, false financial

statements and fictitious persons); *United States v. Edelmann*, 458 F.3d 791, 815-16 (8th Cir.

2006) (defendant created numerous false documents, including multiple years of tax returns,

supporting documents, such as W-2 and 1099 forms, bank statements, articles of

incorporation, profit and loss statements, and bank letters); *United States v. Amico*, 416 F.3d

163, 169 (2nd Cir. 2005) (defendant used false bank documents; the solicitation and creation

of false appraisals; the creation of false blueprints; submission of false blueprints to town

officials in order to inflate the assessment of home values; collusion with the attorney

representing many of the purchasers at closing); *United States v. Moncrief*, 133 Fed. Appx.

924 (5th Cir. 2004)(unpublished), certiorari granted, judgment vacated by *Moncrief v. United

States*, 544 U.S. 1029 (2005) (sophisticated means was employed in mortgage fraud scheme).

As outlined above in the excerpted agreed factual statement, Defendant Sobol and her

co-defendants employed many, if not most, of the means relied upon by courts in the above

cited decisions to support application of the sophisticated means enhancement.  Ms. Sobol

herself created and oversaw the creation of false tax documents, bank statements,

verifications of employment (some of which included the creation of fictitious businesses),

loan applications, and verifications of assets.  Those false documents were then used by her

co-defendants to secure loans.  The fraudulently obtained loans were closed at an escrow

company operated by other participants in the scheme.  Operation of the escrow company

facilitated control over the closing process, preventing lenders from discovering the fraud.

This concealment was essential to the success of the scheme.  It permitted the fraud to

continue unabated for over two years.

### C.   The Scheme To Defraud Involved Ten (10) Or More Victims

Both the government and the Probation Office contend the two (2) level enhancement

authorized by USSG §2B1.1.(b)(2)(A) is applicable because the charged and agreed scheme

Government's Sentencing Memorandum
Sobol, Alla
Baydovskiy et al., CR-09-0084-MJP) - 13

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

involved ten (10) or more victims.  As noted in the Declaration of James C. Vach, filed contemporaneously with this memorandum, the government identified twelve lenders who extended loans on the basis of false and fraudulent information submitted by those participating in the scheme.  Vach Declaration at ¶ 3.  Information recently developed to assist the court in establishing a reasonable estimate of the losses attributable to the fraud scheme identified ten (10) lenders or servicing companies reporting losses from loans extended on the basis of false and fraudulent information.  Vach Declaration at ¶ 5.

**D.     Defendant Alla Sobol Was Both A Leader And An Organizer Of The Scheme**

Ms. Sobol seeks to avoid the four level enhancement based on her role as both an organizer and leader of the scheme by suggesting, in part, that her participation was shorter in duration than that of co-defendants Vladislav Baydovskiy and Viktor Kobzar.  While it is true that Messrs. Baydovskiy and Kobzar operated the scheme under the Kobay name without Ms. Sobol's participation for several years, her decision to acquire a mortgage brokers license and then operate Nationwide under that license was critical to the success of the scheme.  Nationwide could not have conducted business with a valid license.  Messrs. Baydovskiy and Kobzar could not acquire the required license due to regulatory issues concerning past deceptive practices.

Ms. Sobol was not ignorant of her partners past business practices.  Despite this knowledge, or possibly because of it, she elected to both join in operating the mortgage brokerage business and participate in the formation and operation of Emerald City Escrow. As an experienced professional in mortgage lending business, Ms. Sobol was well aware of the benefit of having a captive escrow company to facilitate the scheme.  She participated in discussions with Vladislav Baydovskiy that led to the decision to have her husband and co-defendant, David Sobol, assume the managerial duties for Emerald City Escrow.  It is very unlikely that he would have undertaken those duties without her direction.

//

//

//

Government's Sentencing Memorandum
Sobol, Alla
Baydovskiy et al., CR-09-0084-MJP) - 14

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

## IV.   RECOMMENDATION & JUSTIFICATION

### A.   Criminal Fine, Restitution, Supervised Release

The government believes that Ms. Sobol lacks the necessary resources to pay both a criminal fine and the mandatory restitution obligation to be sought by the government. Consequently, the government will not oppose a request that the fine be waived.

The charged conduct to which Ms. Sobol pled guilty involved offenses "committed by fraud or deceit," imposing a mandatory restitution obligation.  18 U.S.C. §3663A(c)(1)(A)(ii). Section 3663A(d) of the Mandatory Victim Restitution Act provides that "[a]n order of restitution under [the Act] shall be issued and enforced in accordance with section 3664. 18 U.S.C. § 3663A(d).  Determining the appropriate restitution amount in this case presents some legal and factual issues requiring supplemental briefing and testimony.  This court has scheduled a joint restitution hearing for January 29, 2010.

Finally, the government concurs with the Probation Office's recommendation to impose a three year term of supervision.  Three years of oversight is necessary to reduce the likelihood of recidivism.

### B.   Term of Imprisonment

In consideration of the following factors set forth in 18 U.S.C. § 3553(a), together with an advisory guideline range capped by the statutory maximum of sixty (60) months as advocated by the government, the government recommends that this Court sentence Defendant Sobol to forty-eight (48) months of imprisonment.

#### 1.   The Nature and Circumstances of the Offense

Unfortunately, the mortgage fraud scheme perpetrated by Defendant Sobol and her co-conspirators in this case was not unique.  Prosecutors nationwide are investigating and have charged numerous schemes involving the same, or similar, deceptive acts. http://www.fbi.gov/publications/fraud/mortgage_fraud08.htm.  The tremendous scale of the problem has led many to label mortgage fraud as a significant contributor to our nation's financial problems.  Fraud perpetrated by those involved in the mortgage lending industry has caused massive losses to lenders and is responsible for the failure of banks and private

Government's Sentencing Memorandum
Sobol, Alla
Baydovskiy et al., CR-09-0084-MJP) - 15

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  lending institutions.  Investors in mortgage backed securities have lost funds needed for

2  income and retirement.  Home values have been distorted by inflated appraisals leading to a

3  shortage of affordable housing.  Foreclosures caused by mortgage fraud have riddled

4  neighborhoods with abandoned houses and properties in disrepair.

5       A consistent sustained increase in home values led to relaxed loan underwriting

6  standards.  Loan applications, appraisals, and real estate closing documents were not closely

7  scrutinized because the residential real estate industry assumed the rising real estate values

8  would insure that lenders would recoup their funds from the sale of the home if they had to

9  foreclose.  In addition, it was assumed that homeowners unable to afford their mortgage

10 payments would simply re-finance based on the ever increasing value of their homes.

11      Several professionals in the residential real estate industry, including Defendant Sobol

12 and her co-defendants in this case, seized on opportunities presented by these market

13 conditions.  They took advantage of the decreased scrutiny and a rising market by

14 orchestrating real estate transactions using fraudulently inflated prices, falsified borrower

15 qualification documents, and sham closings to divert loan proceeds to themselves.  Lenders

16 were left with both unqualified borrowers lacking the resources to honor their loan

17 commitment, and overvalued properties to securitize the debt.  The well documented collapse

18 of the residential real estate market exposed the fraud.  Lenders could no longer look solely

19 to the pledged properties to recover their losses.

20      The government anticipates that one or more of the defendants will seek to rely on the

21 decreased scrutiny in the residential real estate lending markets as a mitigating factor for their

22 own conduct.  Any suggestion that this Court should discount a particular defendant's

23 personal responsibility for preparing and submitting fraudulent documents and making false

24 representations in an orchestrated effort to obtain loan proceeds should be summarily denied.

25      There is no basis in the law or equity for the proposition that criminal conduct be

26 excused because the victim failed to take adequate measures to protect themselves or their

27 property.  The relaxed underwriting standards employed by lenders prior to collapse of the

28

Government's Sentencing Memorandum
Sobol, Alla
Baydovskiy et al., CR-09-0084-MJP) - 16

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    residential real estate market were neither an invitation to commit fraud nor an excuse for

2    those unscrupulous enough to steal.

3        The particular scheme charged and admitted to by Ms. Sobol, while not unique in its

4    methodology, required the collaborative efforts of mortgage brokers, loan officers,

5    accountants, and escrow closers.  Each played a vital role in developing, implementing and

6    perpetuating the scheme.  Any one of the scheme participants could have withdrawn and

7    reported the illegal activity.

8        **2.      History and Characteristics of the Defendant**

9        Ms. Sobol had several years of experience in the mortgage lending business before

10   joining co-defendants Kobzar and Baydovskiy at Nationwide.  She applied that experience to

11   further the scheme, drawing others into the effort to mislead lenders into making loans based

12   on false and fraudulent representations.

13       As noted in the parties' Plea Agreement, Ms. Sobol agreed to cooperate fully in the

14   government's investigation of the charged scheme.  She has fully honored that commitment

15   by providing several interviews during which she provided information related to the

16   activities of her co-defendants as well as others in the mortgage industry.  The information

17   has been very useful based in part on her extensive history in the industry.

18       The government also acknowledges Ms. Sobol's timely decision to enter into a plea

19   agreement.  She was the first defendant to admit to the charged conduct and her decision,

20   together with corresponding commitment to cooperate, likely contributed to her co-

21   defendants subsequent decisions to reach similar agreements.

22       **3.      Reflect Seriousness of Offense, Promote Respect for the Law, and
              Provide Just Punishment**

23       As noted in sub-section 1 above, the mortgage fraud scheme perpetrated by Ms. Sobol

24   and her co-conspirators was largely successful due to relaxed oversight by lenders.  Lenders

25   relied, to their detriment, on the truthfulness of representations made by Ms. Sobol and her

26   co-conspirators regarding a borrower's purported qualifications and the value of the

27   properties to be pledged as security for the fraudulently obtained loans.  Motivated by simple

28

Government's Sentencing Memorandum
Sobol, Alla
Baydovskiy et al., CR-09-0084-MJP) - 17

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

greed and the perceived reduced risk of detection, Ms. Sobol and her colleagues were undeterred by ethical constraints to make true and accurate representations regarding property values and a prospective borrower's creditworthiness.

The recommended forty eight (48) month term of imprisonment would go a long way toward signaling to the entire real estate industry the seriousness with which fraudulent practices will be sanctioned. The standards of honesty and transparency so readily abused and ignored by the defendants in this case would best be served by significant terms of imprisonment. Judicial recognition that dishonest business practices will not be excused regardless of "market conditions" would be underscored by imposing the requested sentence.

### 4.      Afford Adequate Deterrence to Criminal Conduct

The government has every reason to believe that this prosecution, together with a custodial sentence of the requested duration, would deter Ms. Sobol from engaging in further criminal conduct. An equally important consideration, however, is the deterrent effect this prosecution and the resulting sentences will have on the broader real estate and mortgage lending industries. As discussed above, countless others employed in the mortgage lending industry profited from using many of the same fraudulent practices prosecuted in this case.[3]

These professionals presumably engaged in a risk analysis, concluding that the threat of detection and accountability was outweighed by the loan proceeds so readily stolen from lenders and unwitting borrowers. The significant terms of imprisonment sought by the government for all of the defendants in this case would signal to others in the industry an increased risk to engaging in similar fraudulent conduct, tipping the balance in favor of honest and transparent business dealings.

---

[3]The Mortgage Asset Research Institute's March 2009 report to the Mortgage Bankers Association reports that "fraud incidence is at an all-time high," and "[e]merging fraud trends are further draining lender, law enforcement, and consumer resources in the industry's most challenging times." http://www.marisolutions.com/resources-news/press-release-20090316.asp There were 63,713 mortgage fraud related suspicious activity reports filed with FinCEN in fiscal year 2008, compared to 17,127 such reports in fiscal year 2004 --an increase of 370%.

Government's Sentencing Memorandum
Sobol, Alla
Baydovskiy et al., CR-09-0084-MJP) - 18

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

### 5.    Avoid Unwarranted Sentence Disparity Among Defendants

Ms. Sobol was one of the three principals of Nationwide; she and her fellow principals, co-defendants Baydovskiy and Kobzar, were the experienced leaders of the scheme.  Her participation, however, was distinguishable from that of Messrs. Baydovskiy and Kobzar.  The distinction warrants a lesser sentence than either of her fellow principals.

One of the fraudulent practices employed by the scheme included recruiting otherwise unqualified borrowers to purchase "investment" properties.  False documents were prepared and submitted to lenders to secure purchase money loans.  A significant portion of the loan proceeds were diverted to the co-defendants without the knowledge of the borrowers, leaving the borrower with less proceeds and an overvalued property.  Based on the government's investigation, Ms. Sobol did not actively engage in this aspect of the fraud scheme.

In addition, the government concurs with her claim that she voluntarily withdrew from the scheme in late 2008.  It was a decision not shared by Messrs. Baydovskiy or Kobzar who continued to submit fraudulent loan applications well into 2009.  The government has not formulated a sentencing recommendation for defendants Vladislav Baydovskiy and Viktor Kobzar.

### C.    Conclusion

The mortgage fraud scheme perpetrated by Ms. Sobol and her co-defendants took advantage of market conditions that enabled those motivated by dishonest intentions to reap significant benefits with very little risk of detection.  Fueled by greed, without any apparent regard for ethical business dealings, Ms. Sobol and her co-defendants were undeterred in their collective pursuit for fraudulent loans.  It was not until the near collapse of the real estate markets and the corresponding tightening of lending standards that the defendants' activities were slowed. The sentences this court will impose on Ms. Sobol and her co-defendants provide an opportunity to send the message that mortgage fraud, not unlike any other fraud, will be sanctioned as serious criminal conduct.  The government's recommended sentences accomplish this objective.

Government's Sentencing Memorandum
Sobol, Alla
Baydovskiy et al., CR-09-0084-MJP) - 19

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  DATED this 30th day of November, 2009

2

3                                                  Respectfully submitted,

4                                                  JENNY A. DURKAN
                                                   United States Attorney

5                                                  /s/ James D. Oesterle
6                                                  JAMES D. OESTERLE
                                                   WSBA # 16399
7                                                  Assistant United States Attorney
                                                   United States Attorney's Office
8                                                  700 Stewart Street, Ste. 5220
                                                   Seattle, WA 98101
9                                                  Facsimile:  206-553-2502
                                                   Phone:  206-553-5040
10                                                 E-mail: jim.oesterle@usdoj.gov

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 30, 2009 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the defendants.

*/s/ Kimberly King*
KIMBERLY KING
Legal Assistant
United States Attorney's Office
700 Stewart Street, Ste. 5220
Seattle, Washington 98101
Phone: (206) 553-5127
Fax:    (206) 553-2502
E-mail: Kimberly.King3@usdoj.gov

Government's Sentencing Memorandum
Sobol, Alla
Baydovskiy et al., CR-09-0084-MJP) - 21

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970