The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

               Plaintiff,

   v.

ALLA SOBOL,

               Defendant.

NO. CR 09-0084 MJP

DEFENDANT ALLA SOBOL'S
SENTENCING MEMORANDUM

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1

## TABLE OF CONTENTS

2

Page

I.    INTRODUCTION……………………………………………………..4

3

II.   STATEMENT OF THE CASE……………………………..…………………4

4

III.  *BOOKER, RITA, KIMBROUGH, GALL* AND THE
      CURRENT SENTENCING PARADIGM……………………………………4

5

6

IV.   HISTORY AND CHARACTERISTICS OF
      THE DEFENDANT AND THE NATURE AND
      CIRCUMSTANCES OF THE OFFENSE……………………………..………7

7

8

      A.    Early Life in the Ukraine……………………………………………7

9

      B.    Living in the United States…………………………………………8

10

      C.    Work and School in Seattle……….…………………………………9

11

      D.    Ms. Sobol's First Job after College and Entry into the
            Mortgage Industry at Washington Mutual……………………………...10

12

      E.    Employment as a Loan Processor at First Northwest Mortgage…………...11

13

      F.    Employment as a Loan Representative for Central Banc and
            Countrywide………………………………………………………...11

14

      G.    Marriage and Family Life……………………………………………12

15

      H.    Vladislav Baydovskiy…………….…….……………………………13

16

      I.     Ms. Sobol Voluntarily shuts down Nationwide in October 2008…………...15

17

      J.     Arrest, Jail, and Home Detention…………………………………...15

18

V.    CALCULATION OF THE ADVISORY SENTENCING
      GUIDELINES…………..…………………………………………………16

19

20

VI.   THE RELATIVE CULPABILITY OF THE VARIOUS DEFENDANTS
      AS MEASURED BY THE LENGTH OF TIME INVOLVED IN THE
      OFFENSE AND THE NEED TO AVOID UNWARRANTED
      SENTENCING DISPARITIES AMONG THE DEFENDANTS…………………...17

21

22

VII.  THE FACT THAT MS. SOBOL VOLUNTARILY TERMINATED THE
      OPERATIONS OF NATIONWIDE PRIOR TO THE INITIATION OF
      THE LAW ENFORCEMENT INVESTIGATION DEMONSTRATES AN
      EXTRAORDINARY ACCEPTANCE OF RESPONSIBILITY AND
      JUSTIFIES A LOWER SENTENCE……..……………………………….....19

23

24

25

26

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 2

11911 00101 lk109902

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

**TABLE OF CONTENTS** (continued)

Page

VIII.  MS. SOBOL'S EARLY COOPERATION WITH THE GOVERNMENT
       DEMONSTRATES THE DEPTH OF HER ACCEPTANCE OF
       RESPONSIBILITY AND ASSISTS THE GOVERNMENT AND
       THE COURT IN THEIR RESPONSIBILITIES TO BE
       GOOD STEWARDS OF THE FEDERAL GOVERNMENT'S
       SCARCE RESOURCES…………………………………………………...20

IX.    THE RELATIVELY SMALL NUMBER OF FALSE LOAN FILES
       THAT INVOLVE A LOSS TO THE LENDER IN WHICH MS. SOBOL
       WAS ACTIVELY INVOLVED IS ONE MEASURE OF
       MS. SOBOL'S RELATIVE CULPABILITY…………………………………...22

X.     THE SETTLEMENT WITH ING DEMONSTRATES AN
       EXTRAORDINARY ACCEPTANCE OF RESPONSIBILITY……………….23

XI.    THE SEIZURE OF HUNDREDS OF THOUSANDS OF
       DOLLARS IN CASH AND PROPERTY IS A SUBSTANTIAL
       PUNITIVE SANCTION IMPOSED ON MS. SOBOL AND
       A SUBSTANTIAL BENEFIT TO THE GOVERNMENT...………………..…24

XII.   EXEMPLARY PERFORMANCE ON PRETRIAL SERVICES
       SUPERVISION…………………………………………………………………25

XIII.  CONCLUSION………………………………………………………………25

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 3

11911 00101 lk109902

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**SENTENCING MEMORANDUM**

## I.    INTRODUCTION

The Defendant Alla Sobol is before the Court for sentencing pursuant to her entry of a plea of guilty to one count of conspiracy to commit bank fraud, a violation of 18 U.S.C. § 371.  Sentencing is scheduled for Friday, December 4, 2009 at 2:15 p.m.  This is Ms. Sobol's Sentencing Memorandum.

## II.   STATEMENT OF THE CASE

On March 25, 2009, Ms. Sobol was charged by Indictment with various offenses involving conspiracy to commit bank fraud, mail and wire fraud, false statements on loan applications and monetary transactions using criminally derived property.  Ms. Sobol was arrested on March 26, 2009.

On May 15, 2009, after a series of detention hearings, Ms. Sobol was ordered released on conditions from United States Marshal's custody.  Since that time, Ms. Sobol has remained on home detention with GPS monitoring, under Pretrial Services Supervision.

On July 1, 2009, a Superseding Indictment was filed, charging Ms. Sobol with one count of conspiracy to commit bank, mail and wire fraud, in violation of 18 U.S. C. § 371. On July 2, 2009, Ms. Sobol pled guilty as charged in Superseding Indictment.

This matter now comes before the Court for sentencing.

## III.  *BOOKER, RITA, KIMBROUGH, GALL* **AND THE CURRENT SENTENCING PARADIGM**

In a series of cases beginning in 1999, the United States Supreme Court examined the historical roots of the right to jury trial in both the original Constitution and the Bill of Rights. *See* U.S. Const. art. III, § 2, cl. 3; U.S. Const. amend. 6.  The Court concluded that the right to jury trial is both an individual right and a structural allocation of power to the people, and held that in order to give it meaningful content, any fact that exposes a defendant to greater potential punishment must be found by a jury beyond a reasonable doubt.  *Jones v. United*

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 4

11911 00101 lk109902

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

*States*, 526 U.S. 227 (1999); *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Blakely v. Washington*, 542 U.S. 296 (2004); *United States v. Booker*, 543 U.S. 220 (2005).  In *Booker*, a majority of the Court applied this reasoning to hold that judicial fact-finding under the mandatory United States Sentencing Guidelines violated the Sixth Amendment.  A different majority (with Justice Ginsburg in both) created a remedy, directing judges to impose a sentence that complies with 18 U.S.C. § 3553(a), to treat the guidelines as merely advisory within that statutory framework, and instructing courts of appeal to review all sentences for reasonableness.

Commencing with *Booker*, the Guidelines are advisory.  *Booker,* 543 U.S. at 245.  A sentencing court is required to "consider Guidelines ranges," but is directed to "tailor the sentence in light of other statutory concerns as well, *see* § 3553(a)."  *Id.* at 245-46.  Thus, under *Booker*, the guidelines are just one of a number of factors a court must weigh in crafting an appropriate and just sentence under a standard of "reasonableness."  *See Booker*, 542 U.S. at 262.  *Accord United States v. Menyweather*, 431 F.3d 692, 700 (9th Cir. 2005). "[D]istrict courts now have more discretion to tailor sentences to the individual circumstances of a defendant."  *United States v. Trujillo-Terrazas*, 405 F.3d 814, 819 (10th Cir. 2005).

Section 3553(a) requires the Court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) . . ." Section 3553(a)(2) states that such purposes are to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs the Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant;" the kinds of sentences available; the need to avoid unwarranted sentencing disparities among defendants with similar

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 5

11911 00101 lk109902

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1    records who have been found guilty of similar conduct; and the need to provide restitution to

2    any victims of the offense. Even before *Booker*, the Supreme Court recognized that "it has

3    been uniform and constant in the federal judicial tradition for the sentencing judge to consider

4    every convicted person as an individual and every case as a unique study in the human

5    failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

6    *Koon v. United States*, 518 U.S. 81, 113 (1996).

7            In *Rita v. United States*, 127 S. Ct. 2456 (2007), *Kimbrough v. United States,* 128 S.

8    Ct. 558 (2007), and *Gall v. United States,* 128 S. Ct. 586 (2007), the Court gave substantive

9    and procedural content to the *Booker* remedy, making clear that § 3553(a) is the controlling

10   sentencing law and rejecting devices that were used after Booker to maintain a *de facto*

11   mandatory guideline system.  The "Guidelines are only one of the factors to consider when

12   imposing sentence." *Gall,* 128 S. Ct. at 602.  The Guidelines, "formerly mandatory, now serve

13   as one factor among several [that] courts must consider in determining an appropriate

14   sentence." *Kimbrough,* 128 S. Ct. at 564.

15           "Many judges have criticized the guidelines not only for their inflexibility, but also for

16   their unnecessary harshness in many cases."  *United States v. Ranum*, 353 F. Supp. 2d 984,

17   986 n.1 (E.D. Wis. 2005).  In determining a "reasonable" sentence, § 3553(a) directs the

18   Court to "impose a sentence sufficient, but not greater than necessary, to comply with the

19   purposes [of § 3553(a)(2)]," a provision sometimes called the "parsimony provision."  Now

20   that the Guidelines are advisory and subordinate to 18 U.S.C. § 3553(a) as a whole, the

21   "parsimony provision" is applied in the broader context of assessing how much punishment is

22   fair and reasonable for a particular person in a particular case.  Regarding imprisonment, 18

23   U.S.C. § 3582(a) states:

24           The court, in determining whether to impose a term of imprisonment, and, if a
             term of imprisonment is to be imposed, in determining the length of the term,
25           shall consider the factors set forth in section 3553(a) to the extent that they are
             applicable, recognizing that *imprisonment is not an appropriate means of*
26           *promoting correction and rehabilitation.*

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 6

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

11911 00101 lk109902

(emphasis supplied).  The importance of this principle is stated by the United States Supreme Court.  "The statute, as modified by Booker, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to achieve the goals of sentencing."  *Kimbrough,* 128 S. Ct. at 570.

## IV.   HISTORY AND CHARACTERISTICS OF THE DEFENDANT AND THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Section 3553(a) requires the Court to first consider the "history and characteristics of the defendant and the nature and circumstances of the offense."

### A.   Early Life in the Ukraine

Alla Pyatetsky was born in 1981 in Vinnitsa, Ukraine, when the Ukraine was a part of the Union of Soviet Socialist Republics.  Her mother, Diana Arshinova Pyatetskaya, was a music teacher.  Her father, Igor Pyatetsky, worked as a watch repairman.  Their families were Russian Jews who had lived in this part of the Ukraine for many generations.  Igor divorced Diana and left the family in 1985, when Alla was four years old.  Igor Pyatetsky emigrated from the Ukraine to the United States.

Alla was 5 years old when the Chernobyl nuclear power plant disaster occurred.  Diana reports that Alla—among many others in the region—became very sick from the radiation.

> My daughter suffered tremendously in Ukraine under many circumstance the first being; after the April 1986 nuclear blow up in Chernobyl that geographically we were very close to in proximity.  The government issued no warnings or cautions and let everyone believe everything was ok yet we all saw horrible things happen before our eyes.  Alla became very sick.  She couldn't leave the house because every time she did she developed an extremely high fever and she was very weak all the time.  She wanted to go to preschool but couldn't because of the effects of the radiation had on her.  I saw many children die after Chernobyl and was scared all the time for my daughter, she was suffering for months and not getting better.

Letter from Diana Pyatetskaya to Judge Pechman at Exhibit A, page 30.

Although the Ukraine had been a center of Jewish culture, it also had a history as a focal point of anti-Semitism.  During the German occupation of World War II, the Ukraine

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 7

Skellenger Bender, PS
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

11911 00101 lk109902

had been the site many of the most notorious mass murders and extermination camps perpetrated by the Nazis.  As a member of the post-war Union of Soviet Socialist Republics, the Ukraine was still a hotbed of pervasive discrimination against the Jews.  Jews were generally not permitted to openly attend the higher schools or advance as professionals. Because Diana and Alla were Jewish, Diana decided to leave the USSR to escape the persecution and to live in a country with greater opportunity.

> My daughter and I were already looked down on because we were Jewish so
> there was already extreme hate and suspicion towards us. That is another
> reason why I wanted to leave Ukraine I knew that there would be no chance
> for higher education or any sort of successful future at the time. Jewish people
> were not allowed to go to advanced schools or practice any religion or we
> would be put in prison indefinitely.  I also didn't want Alla to go through the
> name calling and harassment for being Jewish as often as I had, and my
> friends and parents were during our entire life. If anyone found out that we
> stepped in to a synagogue I would have been immediately fired from my job
> and Alla would be kicked out of school. So with all those conditions I knew I
> had to do whatever I could to leave the country.

Letter from Diana Pyatetskaya to Judge Pechman at Exhibit A, page 30.  Diana was able to take Alla to the United States in 1989, when Alla was only 8 years old.  Diana and Alla were able to remain in the United States, and eventually to become citizens, by receiving asylum status due to the religious persecution suffered by them in the USSR.  PSR at par. 57.

### B.    Living in the United States

Alla faced many of the same difficulties that any new immigrant faces upon receiving asylum in the United States:

> It was difficult for me to adapt to an entirely new culture when we moved to
> the United States.  I had to learn the language and culture and felt that people
> were looking at me and treating me differently because I was a foreigner.  I
> am sure that these are the same difficulties that many immigrants face when
> trying to assimilate into the American culture.

Letter from Alla Sobol to Judge Pechman (November 20, 2009) at page 1.  (This letter to the Court was submitted to U.S. Probation and is attached to the PSR.)

When Alla and Diana came to the United States, they had no place to live and, out of necessity, were forced to live with Igor Pyatetsky in Brooklyn, New York.

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 8

11911 00101 lk109902

> So even though my ex husband was extremely abusive I asked for his help to come the United States.  We left everything we knew and came to a country where my ex-husband and Alla's father was.  Since we had nowhere to go we ended up living with him. He took advantage of that situation and was constantly verbally and physically abusive.

Letter from Diana Pyatetskaya to Judge Pechman at Exhibit A, page 30.

During the time that they lived with Alla's father in Brooklyn, Igor Pyatetsky was extremely physically and verbally abusive.  He would frequently scream and yell at both Alla and Diana.  He beat Diana physically with his fists while Alla watched.

> He always had jealous rages and would pull Alla out of school in the middle of the day and grill her about what I was doing and told her if she told me he would kill all of us including himself. I was always scared for Alla and what this was doing to her.  There were also instances when he would beat me in front of Alla especially on holidays or birthdays just to show how much he was in control. There was an instance where he pulled out a knife and threatened to kill me and him and Alla was able to escape and call the neighbors for help. I realized all the suffering that Alla and I were going through but I was very new to the country didn't speak the language and unlike today I didn't realize the domestic violence laws of the U.S. because in Russia the police did not intervene in most cases in domestic violence situations.

Letter from Diana Pyatetskaya to Judge Pechman at Exhibit A, pages 30-31.  Alla's family moved to Seattle in 1991 when she was ten years old.  Shortly thereafter, Igor Pyatetsky packed up his clothes, left the family, and they never lived with him again.  PSR at par. 57-59.

### C.     Work and School in Seattle

Alla always worked hard in school to be a good student and achieve good grades.  She worked equally hard to financially provide for herself and her family.

> [Alla] worked the entire time she was in high school and college often holding two jobs at once.  She paid for her own car and her education and never asked me for any help.

Letter from Diana Pyatetskaya to Judge Pechman at Exhibit A, page 31.

> I have worked constantly since I was in high school.  I started working at in 1996 when I was 15 years old.  My first job was as a cashier at the Fresh Choice Salad Bar.  In 1998, I worked as the front desk supervisor for The Spa at the Woodmark.  I then got a job at See's Candies in 1999 as an assistant manager.  That year, I graduated from Sammamish High School and was accepted to the University of Washington.

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 9

Skellenger Bender, PS
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

11911 00101 lk109902

1   Letter from Alla Sobol to Judge Pechman (November 20, 2009) at page 1.

2
3
> During the time that I went to college, I also worked full time to support myself and never took out student loans or asked for financial assistance. While going to college full time, I continued working at See's Candies and started working for Elite Home Care part time – which I continued to work at part time until January of 2009.  Elite Care works with the elderly population. At the same time, I attended many continuing education classes for working with the elderly and received eight certifications in elder abuse, death and dying, CPR, first aid, dental care, diabetes education, and the fundamentals of care giving.  In 2001, again while attending the UW, I worked part time as a sales associate at Macy's.  I then went to work for Definitive Motors as a title clerk.  I had this job at the same time as the Macy's and Home Care.  These were all part time jobs I had to support myself while I was attending college.

9   Letter from Alla Sobol to Judge Pechman (November 20, 2009) at page 2.

10          Alla graduated from the University of Washington in two years by taking an

11  abnormally high course load and working through the summers.  She graduated in the

12  Summer of 2001 with a Bachelor of Science degree.  PSR at Par. 67.

13          **D.    Ms. Sobol's First Job after College and Entry into the Mortgage Industry at Washington Mutual**

14          Alla had saved her hard-earned money and at the age of 20, was able to afford the

15  down payment on her own condominium.  After an extreme work and school schedule, she

16  took a few months break after graduating from college.  After September 11, 2001, the

17  economy stalled and crashed.  She then found it very difficult to get a job.

18          Because she could not find the type of professional job she had hoped for, Alla went to

19  a temporary job placement agency and was placed in one of the only industries that was hiring

20  at the time, the mortgage industry.  The mortgage industry was active because of the rate drop

21  after the economy crashed following September 11.  In late September 2001, Washington

22  Mutual Wholesale Division hired Alla as an entry level loan processor at $11.00 per hour.

23  After working a few months, WAMU realized that Ms. Sobol was a hard worker and offered

24  her a stable job with higher pay and benefits.  Letter from Alla Sobol to Judge Pechman

25  (November 20, 2009) at page 2.

26

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 10

11911 00101 lk109902

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

Ms. Sobol was 20 years old.  Washington Mutual (WAMU) was Ms. Sobol's first professional job out of college and the place where she was taught what it took to be successful in the mortgage business.  WAMU was not a good place to learn ethical and sound mortgage practices at this particular time.   The mortgage industry was booming and Washington Mutual was struggling to compete in the subprime mortgage market with Countrywide and a host of other lenders.  Loan officers at WAMU were constantly instructed to originate loans, regardless of the risk or the documentation of the ability of the borrower to repay the loan.  *See generally*, Drew DeSilver, *Part One:  Reckless Strategies Doomed WaMu*, and David Heath, *Part Two:  WaMu:  Hometown Bank Turned Predatory,* The Seattle Times, October 25 and 26, 2009, attached as Exhibit B, pages 43-61.  As a processor, Ms. Sobol was instructed to avoid verifying income or assets, and to take whatever information the loan officer provided on the loan application forms.  These were called no doc, low doc, stated/stated loans, etc, WAMU also accepted NIV (no income verification loans).  This was standard practice at WAMU.  *Id.*  Letter from Alla Sobol to Judge Pechman (November 20, 2009) at page 3.

### E.      Employment as a Loan Processor at First Northwest Mortgage

Ms. Sobol was a successful loan processor at Washington Mutual.  Because loan processors were in high demand, Ms. Sobol was offered a better job and moved on from WAMU.  From August 2002 until July 2003, Ms. Sobol worked as a loan processor, first at Conseco Financial, and then at First Northwest Mortgage in Bellevue.   First Northwest Mortgage was a reputable mortgage brokers' shop.  For the last few months of this job, Ms. Sobol was employed as a loan officer originating loans.  PSR at Par. 70-71.  Ms. Sobol was not involved in any fraudulent activity at this institution.

### F.      Employment as a Loan Representative for Central Banc and Countrywide

From August 2003 until March 2006, Ms. Sobol worked for Central Banc Mortgage in Bellevue.  John Delaney was the President.  Central Banc was a sub-prime wholesaler of

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 11

11911 00101 lk109902

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

mortgages.  Central Banc would underwrite and fund mortgage loans on a line of credit, then immediately resell the loans to different banks or investors.  Ms. Sobol was one of several loan representatives who would go into the mortgage broker shops in the area and tell loan brokers about the various loan programs that were offered by Central Banc.  John Delaney determined the loan guidelines, the rate structures, and the level of risk that would be undertaken by Central Banc.  Mr. Delaney's decisions appeared to be determined by where he could market the loans.  Ms. Sobol did not originate any loans at Central Banc.  She was not involved in approving or disapproving loans.  Letter from Alla Sobol to Judge Pechman (November 20, 2009) at page 3.

From February 2006 until August 2006, Alla Sobol worked for Countrywide as an account executive for the sub-prime division.  Countrywide was also a sub-prime wholesaler that took on risky loans at very high interest rates.  Countrywide would also underwrite the loan and fund it on a line of credit, then immediately (usually the same day) resell the loan to different banks or investors.  Alla Sobol was one of about ten account executives in Washington (and hundreds, maybe thousands, across the entire country) who would go into the mortgage broker shops and tell loan brokers about the loan programs that were offered by Countrywide.  Countrywide determined the borrower verification requirements, the loan guidelines, the rate structures, and the level of risk that would be undertaken.  Ms. Sobol marketed the loan programs as she was instructed by Countrywide.  Ms. Sobol did not originate any loans at Central Banc.  She was not involved in approving or disapproving loans or setting loan policy.  At Countrywide, the files all went directly to Colorado, where all the underwriting decisions were made.  Letter from Alla Sobol to Judge Pechman (November 20, 2009) at page 4.

### G.     Marriage and Family Life

In August 2004, Alla met David Sobol.  She was 23 years old.  David Sobol was 35 years old, and recently divorced with a pre-teen child.  Alla and David were married in March

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 12

11911 00100 lk109902

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

2005, when Alla was 24 years old.  Their son R.S. was born in 2007.  When Alla met David Sobol, he was in the import-export business.  In 2005, David Sobol passed his real estate license and became a successful real estate salesman working for Skyline Properties.

Alla and David continued to live together until February 2009, when they separated and jointly filed for divorce.  They are in the process of finalizing their divorce.  R.S. has lived with Alla since February, with the exception of the approximately two months of her incarceration at the FDC, when he lived with Alla's mother, Diana, at Diana's home.  Since her release on Pretrial Services supervision, Alla and R.S. have continued to live at Diana's house, as Diana is Alla's third party custodian.

### H.    Vladislav Baydovskiy

Alla had earlier met Vladislav Baydovskiy when she was a student at the University of Washington.  Mr. Baydovskiy dropped out of school, however, and Alla did not have contact with him for several years.  Alla became reacquainted with Mr. Baydovskiy when she was working at Central Banc and Mr. Baydovskiy was running Kobay Financial Corporation, a mortgage brokerage business.

> I ran into him again when working at Central Banc and we resumed our friendship.  At the time, he seemed to me to be very charming and I was very impressed by his and Viktor Kobzar's apparent success.  Vlad and Viktor were driving matching luxury cars (Lamborghinis), buying matching million dollar condos in Lincoln Square, and living a lavish lifestyle. To me, at the time, I guess that I was impressed to see someone of my generation and background as a Russian immigrant achieve the level of wealth and success that I thought they had.  I see now that I was foolish to think this.

Letter from Alla Sobol to Judge Pechman (November 20, 2009) at page 4.

When Mr. Baydovskiy and Viktor Kobzar approached her about going into business together with the two of them, Alla was flattered, and agreed to do so.  Mr. Baydovskiy and Mr. Kobzar had created Nationwide Home Lending earlier, in November of 2005.  Alla took and passed the mortgage broker's test in 2006.  Beginning in September 2006, Ms. Sobol's name was substituted as the registered mortgage broker for Nationwide.

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 13

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

11911 00101 lk109902

1  Although she did not appreciate this at the time, Alla later learned from Camie Byron

2 that Mr. Baydovskiy and Mr. Kobzar were using Ms. Sobol for her mortgage broker's license

3 because they and Kobay had run into trouble with the State Department of Financial

4 Institutions.  Letter from Alla Sobol to Judge Pechman (November 20, 2009) at page 4-5.  *See*

5 *also* Camie Byron Proffer Transcript, May 28, 2009, at page 13.

6  Nationwide was organized as follows:  Mr. Baydovskiy, Mr. Kobzar, and Ms. Sobol

7 each received the loan fees on their own originated loans.  Ms. Sobol got nothing from Mr.

8 Baydovskiy's or Mr. Kobzar's loans; they received no fees from Ms. Sobol's loans.  There

9 were also anywhere from 5-10 other contract loan officers at a particular time.  For each loan

10 one of the other contractors originated, they would pay $500.00 to Nationwide, which was

11 split equally between Mr. Baydovskiy, Mr. Kobzar, and Ms. Sobol.  Mr. Baydovskiy was in

12 charge of running the business, including hiring and firing staff, paying the rent, the janitor,

13 the copier fees, negotiating the contracts and all the other expenses.  Mr. Baydovskiy also did

14 the taxes.  Letter from Alla Sobol to Judge Pechman (November 20, 2009) at page 5.  PSR at

15 par. 23 ("Vladislav Baydovskiy controlled the financial operations of Nationwide . . .").

16  The mortgage industry at the time was at its most unregulated and completely out of

17 control.  There were hundreds of small wholesale banks popping up every day, each one with

18 its own special product.  Stated income loans (no verification of income was requested);

19 stated assets loans (no verification of assets was requested); no income stated at all loans; no

20 assets stated at all loans; no appraisal loans; and the 1% negative amortization loan where the

21 customer paid the minimum and the principal balance grew.  Letter from Alla Sobol to Judge

22 Pechman (November 20, 2009) at page 5.  *See generally*, Drew DeSilver, *Part One:  Reckless*

23 *Strategies Doomed WaMu*, and David Heath, *Part Two:  WaMu:  Hometown Bank Turned*

24 *Predatory,* The Seattle Times, October 25 and 26, 2009, attached as Exhibit B, pages 43-61.

25

26

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 14

11911 00101 lk109902

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

I.      **Alla Sobol Voluntarily Shuts Down Nationwide in October 2008**

At some point in 2007, Ms. Sobol decided that she no longer wanted to be business partners with Mr. Baydovskiy and Mr. Kobzar.  In the end of December 2007, Ms. Sobol informed Mr. Baydovskiy that she did not intend to renew her license and intended to close Nationwide.  Mr. Baydovskiy literally got on his knees and started crying, begging Ms. Sobol to renew and assuring her that all would be well.  Letter from Alla Sobol to Judge Pechman (November 20, 2009) at page 5.  *See also* David Sobol Proffer Transcript, June 10, 2009, at page 148.

Feeling pressure from Mr. Baydovskiy, Ms. Baydovskiy, Mr. Kobzar and David Sobol, Alla renewed the license one more time.  Alla reports:

> I felt pressure by Vlad, Neta, Viktor and David to keep my license since they all more or less depended on Nationwide operating, so I renewed my license for the last time.  I should have done the right thing and closed the business then.  I was wrong to continue.  I very much regret not having the courage to stop the business right then.

Letter from Alla Sobol to Judge Pechman (November 20, 2009) at page 5.

In October 2008, Ms. Sobol shut down Nationwide on her own.  To do this, she submitted a surrender of license form to the State Department of Financial Institutions, indicating that Nationwide was no longer in business.  *See* DFI form MU1, dated October 7, 2008, attached as Exhibit C, p. 63.  Ms. Sobol also contacted the lenders, telling them that Nationwide was no longer in business and that they should not accept any more applications.  Letter from Alla Sobol to Judge Pechman (November 20, 2009) at page 6.  Ms. Sobol continued to encourage David Sobol to close Emerald City Escrow, and he did so in December of 2008.

J.      **Arrest, Jail and Home Detention**

On March 26, 2009, Ms. Sobol was arrested in this case.  On May 15, 2009, she was released to home detention and GPS monitoring on Pretrial Services Supervision.

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 15

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

11911 00101 lk109902

## V.      CALCULATION OF THE ADVISORY SENTENCING GUIDELINE RANGE

**Base Offense Level.**  The advisory sentencing guideline range is correctly calculated by the Probation Service pursuant to USSG § 2B1.1.  The base offense level is 6.  USSG § 2B1.1(a)(2).

**Loss Amount.**  As the Presentence Report states, calculation of the actual loss amount presents a number of difficult problems, including, but not limited to:  documentation of any loss at all (at least one bank has directly and falsely represented to the United States Attorney's Office that its loans are in default, when, in fact, they are not); calculation of the net loss where the bank is in the process of selling the property securing the loan; the unavailability of an accurate appraisal of the value of some properties; the lack of reasonable forseeability by individual defendants of a loss on a particular loan where the housing market is expected to continue to rise and credit is expected to remain fluid; the immateriality of a false statement on a particular loan where the lender clearly would have made the loan regardless of the false statement because the loan to value ratios were sound and the borrower otherwise had sufficient income and assets to justify the loan.  Nevertheless, the parties have agreed, that for purposes of determining the advisory guideline range, an upward adjustment of 18 levels, representing an estimated overall loss of $2.5 million to $7 million, is appropriate.

**Victim Related Adjustment.**  The application of this two-level upward adjustment (for 10 or more banks) is not clear at this time.  It is undersigned counsel's understanding that only nine banks have submitted verifiable losses.

**Role in the Offense.**  The 4 level upward adjustment (the maximum allowable) suggested by U.S. Probation overstates Ms. Sobol's role in the offense and distorts her relative culpability as compared with the other defendants, particularly Mr. Baydovskiy and Mr. Kobzar.  Ms. Sobol did, on some transactions, supervise Ms. Byron.  On many others, Ms. Byron acted as her own loan officer and was, in fact, an independent contractor.  Also,

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 16

11911 00101 lk109902

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

loan officers drawing up escrow instructions inevitably provide some level of direction to the escrow officers executing those directions.  Finally, Ms. Sobol did have an ownership interest in Nationwide, obtaining some profit from the contract loan officers, and did permit her mortgage broker's license to be substituted for Mr. Kobzar's license.  On the other hand, it is undisputed that Mr. Baydovskiy and Mr. Kobzar created Kobay and Nationwide and that Mr. Baydovskiy actually managed the day-to-day operations of Nationwide, including exercising control over Nationwide's finances and taxes.  Under these circumstances, no upward adjustment of the offense level is necessary to accurately capture Ms. Sobol's role in the offense as compared to the other participants.  If any adjustment were indicated, a two level adjustment would be sufficient to reflect Ms. Sobol's relative role.

**Acceptance of Responsibility**.  The probation department correctly accords Ms. Sobol a 3 level adjustment for acceptance of responsibility.

**Total Offense Level.**  Ms. Sobol has no criminal history.  With no upward adjustment for role in the offense, the total offense level would be 21.  The resulting guideline would be 37-46 months.  With a two level upward adjustment for her role in the offense, the resulting total offense level would be 23, with a guideline range of 46-57 months.

## VI.   THE RELATIVE CULPABILITY OF THE VARIOUS DEFENDANTS AS MEASURED BY THE LENGTH OF TIME INVOLVED IN THE OFFENSE AND THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES AMONG THE DEFENDANTS.

In some cases, it may be difficult for the Court to confidently sort out the relative culpability of defendants involved in differing, interlocking roles in a conspiracy.  As sentencing approaches, accurate characterizations of various defendants' roles are sometimes distorted as defendants attempt to minimize their exposure to jail time.  A more manageable and objective measure of relative culpability in a case such as this is the length of time that each defendant was actively involved in the misconduct of the conspiracy to which each has plead guilty.

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 17

11911 00101 lk109902

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

In this case, Ms. Sobol was the last defendant to join and actively participate in the misconduct of this conspiracy.  Kobay was operated by Mr. Baydovskiy and Mr. Kobzar beginning in September 2000.  PSR at Par. 21.  Nationwide was established by Mr. Baydovskiy and Mr. Kobzar in 2005.  Vladislav Baydovskiy Plea Agreement, at dkt. 188, page 7, line 6-7.  Camie Byron began working as a loan processor at Kobay in September 2005.  Camie Byron Proffer Transcript, May 28, 2009, at page 27, line 25.  David Sobol and Donata Baydovksiy and Jacob Korn established Emerald City Escrow in September 2005.  David Sobol Plea Agreement, dkt. 126 at page 6, line 10-11.  Sandra Thorpe began writing false verification letters in February 2006.  Sandra Thorpe Plea Agreement, dkt. 135, page 6, line 26.

Ms. Sobol became an owner of Nationwide and her license was substituted as the licensed mortgage broker in September 2006.  PSR at par. 24.  Ms. Sobol actually began personally participating in originating loans in February 2007.  *Id.*  Ms. Sobol was thus the last of these defendants to join and actively participate in the misconduct of this conspiracy.

Sandra Thorpe stopped writing the false verification letters in about March 2008.  Sandra Thorpe Plea Agreement, dkt. 135, page 7, line 15-16.  With the exception of Ms. Thorpe, Alla Sobol was the first of these defendants to leave the conspiracy and stop participating in the criminal activity.  Ms. Sobol left Nationwide and then affirmatively closed it down by completing a Form MU1 and submitting it to the Washington State Department of Financial Institutions on October 7, 2008.  *See* Exhibit C.  David Sobol continued to operate Emerald City Escrow until December 2008.   Mr. Baydovskiy, Mr. Kobzar and Ms. Baydovskiy continued in the mortgage business, including opening or attempting to open a new escrow company (Sierra Escrow) after the closure of Emerald City, and were still involved in the mortgage brokering business at the time of their arrest in March 2009.  Camie Byron continued to participate at least until Alla closed Nationwide and, although this is not entirely clear from the materials currently available, apparently continued to work in some

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 18

11911 00101 lk109902

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1  capacity as a loan officer in the mortgage industry until her arrest in March 2009.  Ms. Sobol

2  had stopped, on her own accord, without being arrested, in October 2008.

3      Ms. Sobol was the last defendant to join and actively participate in the misconduct of

4  this conspiracy and, with the exception of Sandra Thorpe, the first to cease participation in the

5  misconduct of the conspiracy.  The Court should consider these facts—she was the *last*

6  defendant in and the *first* defendant out—as a measure of relative culpability of the

7  defendants in imposing proportional sentences among the defendants in this case.

8  **VII.  THE FACT THAT MS. SOBOL VOLUNTARILY TERMINATED THE
   OPERATIONS OF NATIONWIDE PRIOR TO THE INITIATION OF THE
9      LAW  ENFORCEMENT  INVESTIGATION  DEMONSTRATES  AN
   EXTRAORDINARY ACCEPTANCE OF RESPONSIBILITY AND JUSTIFIES
10     A LOWER SENTENCE.**

11     It is rare that, prior to becoming aware of a law enforcement investigation, a defendant

12  in a fraud scheme voluntarily terminates the fraudulent enterprise, ceasing her own

13  involvement, and at the same time crippling the ability of the other defendants to continue in

14  the fraudulent scheme.  In this case, Ms. Sobol did just that.

15     Ms. Sobol left Nationwide and then affirmatively closed it down on October 7, 2008

16  by submitting a Form MU1 to the Washington State Department of Financial Institutions.  *See*

17  Exhibit C.  As her mother explains:

18         [Alla] would confide in me often how she felt that David wasn't supporting her,
           that she wanted to close her business and she wanted David to close his
19         company but no one would listen to her, and yet with everyones opposition she
           got the strength to close up the business not because the government shut her
20         down but because she knew what she was doing was wrong and she was
           determined to end it. You Honor my daughter acted alone when she closed her
21         business  in October of 2008 no one helped she made the decision on her own
           and was scared of the consequences from everyone else but she still did it.

22  Letter from Diana Pyatetskaya to Judge Pechman at Exhibit A, pages 31-32.

23     This is itself a mitigating factor as well as an independent ground for the Court to

24  impose a sentence below the guideline range.  This is important because it demonstrates that

25  the defendant's remorse and acceptance of responsibility is not just the result of getting

26  caught by the police and the resulting prospect of jail time.  It is rather an independent

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 19

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

11911 00101 lk109902

judgment, exercised by a free will, to stop doing bad things, and to begin doing good things. This is a mitigating fact that justifies a lower sentence. This is a fact that the Court should consider in determining a proportionally appropriate sentence in this case.

## VIII. MS SOBOL'S EARLY COOPERATION WITH THE GOVERNMENT DEMONSTRATES THE DEPTH OF HER ACCEPTANCE OF RESPONSIBILITY AND ASSISTS THE GOVERNMENT AND THE COURT IN THEIR RESPONSIBILITIES TO BE GOOD STEWARDS OF THE FEDERAL GOVERNMENT'S SCARCE RESOURCES.

Alla Sobol was the first of the charged defendants to agree to sit down with the United States Attorney's Office and federal law enforcement agents to provide detailed information about this conspiracy and to provide assistance against the other defendants. Ms. Sobol's first interview with the United States Attorney's Office occurred on April 16, 2009. She met with the Assistant United States Attorneys and gave additional information on May 4, May 22, June 30, and November 17, 2009. On a number of occasions, Ms. Sobol also passed on information requested by the government through her lawyer. The sequence in which these initial proffer sessions occurred is set forth below:

### DATES OF DEFENDANT PROFFER SESSIONS WITH GOVERNMENT ATTORNEYS AND FEDERAL AGENTS

April 16, 2009—Alla Sobol
May 4, 2009—Alla Sobol
May 22, 2009—Alla Sobol
May 26, 2009—Donata Baydovskiy
May 28, 2009—Camie Byron
June 10, 2009—David Sobol
June 17, 2009—Camie Byron
June 25, 2009—Camie Byron
June 30, 2009—Alla Sobol (telecon)
July 28, 2009—Camie Byron
August 28, 2009—Vladislav Baydovskiy
August 3, 2009—Viktor Kobzar
August 12, 2009—Viktor Kobzar
November 17, 2009—Alla Sobol

The transcript of Ms. Sobol's interviews with federal law enforcement authorities was provided to the lawyers for each of the other defendants. It was made known to the other lawyers early on that Ms. Sobol was cooperating with the government. On May 4, 2009, Ms. Sobol's lawyer announced in open court to the other defendants and their counsel that Ms.

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 20

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

11911 00101 lk109902

Sobol was cooperating against the other defendants in the courtroom.  At the time of Ms. Sobol's second detention hearing, the government disclosed in open court that Ms. Sobol was cooperating with the government against the other defendants. (It should be noted that Camie Byron agreed to be interviewed by federal agents at the time of her arrest (March 26, 2009) in her home, but prior to obtaining counsel.)

Ms. Sobol was also the first of the defendants to plead guilty in United States District Court.  The sequence of the guilty pleas of the defendants is set forth below:

## **Date of Plea of Guilty**

July 2, 2009—Alla Sobol
July 7, 2009—David Sobol
July 9, 2009—Sandra Thorpe
July 30, 2009—Camie Byron
September 24, 2009—Donata Baydovskiy
September 25, 2009—Vladislav Baydovskiy
October 2, 2009—Viktor Kobzar

The fact that Ms. Sobol was cooperating with the government early on, and the fact that Ms. Sobol was the first of the defendants to plead guilty, undoubtedly assisted the government and the Court in bringing these matters to a prompt and efficient resolution without unnecessarily expending the government's and the Court's time, money and human resources.  Ms. Sobol's cooperation therefore assisted the government and the Court in their respective responsibilities to be good stewards of the federal government's scarce resources, while at the same time obtaining convictions of all charged defendants.

Ms. Sobol's early cooperation also demonstrates the depth of her acceptance of responsibility.  In the face of daunting potential penalties, it takes courage and a commitment to the truth to be the first defendant to step forward and cooperate against the other defendants, particularly when at least some of the others have been close friends (and in one case, a spouse).  This is particularly so when the defendant is in a forum where the value of her cooperation with the government is uncertain.  Ms. Sobol showed that courage and that commitment to the truth.

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 21

11911 00101 lk109902

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

1    While the other defendants waited back to see whether the government could muster a

2    case against them, Ms. Sobol stepped forward and told the truth that inculpated all of them.

3    Ms. Sobol forthrightly stepped forward and offered to testify truthfully for the government, a

4    move that made it impossible for the other defendants to hold out any hope of success at trial.

5    All of the other defendants eventually followed suit and plead guilty, although some took

6    months to come to the table.  Ms. Sobol took these emotionally difficult steps even though she

7    was chastised by at least one co-defendant, who communicated to her that if she had just kept

8    her mouth shut, all of the defendants could have escaped punishment.  Ms. Sobol and her

9    mother have also been ostracized in the close knit local Russian community for Ms. Sobol's

10   cooperation.

11   Finally, Ms. Sobol has clearly provided information that enables the government to

12   bring others to justice who are not yet charged with a crime.  The fact that Ms. Sobol has

13   provided assistance in the prosecution of others not yet charged is a mitigating fact that the

14   Guidelines and courts throughout the country have traditionally considered in imposing a just

15   sentence.  *See, e.g., United States v. Blue*, 557 F.3d 682 (6th Cir. 2009) (under *Booker*, the

16   court may consider the defendant's cooperation in the context of the 3553(a) factors in

17   imposing a below-guidelines sentence, irrespective of whether a U.S.S.G. § 5K1.1 is filed by

18   the government).

**IX.    THE RELATIVELY SMALL NUMBER OF FALSE LOAN FILES THAT INVOLVE A LOSS TO THE LENDER IN WHICH MS. SOBOL WAS ACTIVELY INVOLVED AS THE LOAN OFFICER IS ONE MEASURE OF MS. SOBOL'S RELATIVE CULPABILITY.**

22   The loss amounts in this case have been analyzed and determined by reference to what

23   the parties have come to refer to as the "Fraud Book."  The Fraud Book is a spreadsheet

24   generated by federal investigators that includes 72 transactions upon which the loss amounts

     are based.  *See* PSR at par. 15.

25   Alla Sobol was the loan officer on 17 of these transactions. (Nos. 7, 8, 27, 28, 36, 41,

26   44, 50, 57, 58, 59, 60, 62, 64, 67, 70, and 71.)  An analysis of these transactions reveals 6

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 22

11911 00101 lk109902

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

loans (Nos. 27, 28, 36, 50, 60, and 67) on which (1) Alla Sobol is the loan officer; and (2) the borrower is at least one month in arrears in payments.  (On one loan (No. 41), the borrower is 17 days behind in payments; it is not clear whether this ought also to be considered by the Court as a "loss" by the bank.)  The relatively small number of false loans files that involve a loss to the lender in which Ms. Sobol was actively involved as a loan officer, as compared with the larger pool of loans, is another measure of Ms. Sobol's relative culpability.  This is a fact that the Court should consider in determining a proportionally appropriate sentence for Ms. Sobol.

## X.      THE SETTLEMENT WITH ING DEMONSTRATES AN EXTRAORDINARY ACCEPTANCE OF RESPONSIBILITY

Several of the defendants in this criminal case, including Alla Sobol and David Sobol, have been sued in United States District Court by ING Bank for losses based on the conduct charged in the Indictment.  *See ING Bank, fsb v. Korn et al., No.* CV 09-00124 TSZ (United States District Court W.D. WA).  Alla Sobol and David Sobol have settled this lawsuit with ING.  In exchange, ING has agreed to release the Sobols from liability:

### Section II, Paragraph 4. Mutual Release.

In consideration of the agreements described herein, and upon completion of all obligations set forth herein, ING does hereby release and discharge the Sobols and their heirs, successors, and assigns, from any and all claims, causes of action, damages, debts, expenses, costs, attorneys' fees, and other taxable costs, and any other demands by ING, arising out of or relating to the real estate transaction and the claims asserted in or arising under the facts as presented in the Lawsuit of whatsoever kind, nature or description, whether past, present or future, known or unknown associated with the claims made in the Lawsuit, except as to the Sobols' duties under this Agreement and the Judgment.   In consideration of the agreements described herein, and upon completion of all obligations subsidiaries, affiliates, officers, directors, partners, employees, agents, lawyers, servants, assignees, successors and/or other transferees or  representatives, from any and all claims, causes of action, damages, debts, expenses, costs, attorneys' fees, and other taxable costs, and any other demands by the Sobols, arising out of or relating to the Lawsuit or the real estate transaction and the claims asserted in or arising under the facts as presented in the Lawsuit of whatsoever kind, nature or description, whether past, present or future, known or unknown associated with the claims made in the Lawsuit.

The foregoing releases do not apply to any other party to the Lawsuit, including without limitation Emerald City Escrow; or to any obligations undertaken by the

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 23

11911 00100 lk109902

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

Parties pursuant to this Agreement or to the claims that are assigned to ING in Paragraph 8 below.

(The ING settlement agreement is subject to a confidentiality provision that limits its public disclosure, but permits disclosure to this Court.  The full agreement will be provided to the Court as a separate exhibit.)  This settlement with one of the principal victims of the charged crime, prior to sentencing, constitutes an extraordinary acceptance of responsibility that the Court should consider in imposing a proportional sentence on Ms. Sobol.

### XI.    THE SEIZURE OF HUNDREDS OF THOUSANDS OF DOLLARS IN CASH AND PROPERTY IS A SUBSTANTIAL PUNITIVE SANCTION IMPOSED ON ALLA SOBOL AND A SUBSTANTIAL BENEFIT TO THE GOVERNMENT.

The government has seized or liened over $900,000.00 worth of cash and assets belonging to Ms. Sobol.  Government's Motion to Maintain Custody of Property, dkt. 158.  These are all of the funds Ms. Sobol has saved from all of her jobs since she was a teenager.  (David and Alla Sobol divided their assets equally in February 2009, as part of their separation and intended dissolution.  The approximate $900,000.00 in cash and assets is Ms. Sobol's half of the Sobols' total net worth.)  The government has indicated an intent to forfeit these assets.

This is a huge punitive sanction imposed personally on Ms. Sobol and her two-year old son, R.S.  It is also a substantial benefit to the United States, arguably sufficient to compensate the government for the investigation of all of the defendants in this case.  Even before *Booker*, such an extraordinary financial penalty was a judicially-recognized ground for a downward departure or variance from the (now) advisory guideline range.  *See, e.g., United States v. Kim,* 364 F.3d 1235, 1245 (11th Cir. 2004) (payment of $280,000.00 restitution by husband and wife defendants by liquidating 75% of their life savings and undertaking enormous debt to pay restitution, after they pled guilty to conspiracy to defraud the United States, was extraordinary enough to justify downward departure from 24 months imprisonment to probation and home detention).  The Court should consider this huge penalty in imposing a proportionally appropriate sentence on Ms. Sobol.

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 24

11911 00101 lk109902

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

## XII.   EXEMPLARY PERFORMANCE ON PRETRIAL SERVICES SUPERVISION

The Magistrate Judge who heard Ms. Sobol's detention hearing (and rehearing) was reluctant to release her, viewing her as a significant flight risk.  The Assistant United States Attorneys who handled this case also viewed her as a significant flight risk.  However, the forthrightness of Ms. Sobol's early cooperation persuaded the government and the Court that Ms. Sobol was not a flight risk or a danger to the community.  Ms Sobol was released from custody on May 15, 2009.  The trust that the government and the Court placed in Ms. Sobol has been rewarded.  The conditions of her release have included home detention and GPS monitoring.  Pretrial Services reports that Ms. Sobol has been in full compliance with the terms of her bond.

## XIII.   CONCLUSION

Ms. Sobol was the last defendant to join and actively participate in the misconduct of the conspiracy charged in the Superseding Information.  Ms. Sobol was (with the exception of Sandra Thorpe) the first one to exit the conspiracy.  Ms. Sobol, David Sobol, and Sandra Thorpe were the only participants in the conspiracy who voluntarily ceased their involvement before they became aware that law enforcement had focused on them.

By her actions in promptly providing assistance to the government and pleading guilty in this case, Alla Sobol has demonstrated that she has accepted responsibility for her actions. It is absolutely clear that she will never be a risk to reoffend.

> I believe and so does Alla that we are responsible for what happens in our lives.  My daughter put herself in the situation that caused these crimes. She chose her business partners, she chose her husband, and she chose to do what she did.
>
> *       *       *
>
> My daughter has accepted the responsibility for her crimes and knows that she will live with a federal felony on her record her whole life, but I hope that she is given a chance to prove to everyone that one mistake doesn't define who she is.

Letter from Diana Pyatetskaya to Judge Pechman at Exhibit A, p. 32-33.

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 25

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

11911 00101 lk109902

Others who know her well understand that Alla has accepted responsibility for her actions:

> Alla is a very kind, loving, giving and intelligent person.  All that is happening to her right now has a very negative impact on her physical and psychological health.  It is hard for her to even think about being away from her son even for a day.  I believe that she has fully understood her mistakes, and accepted responsibility for her conduct.  At this point she is trying to find a job and thinking about continuing her education.  I strongly believe that Alla Sobol will never have problems with the Law in the future; her intelligence will not allow her to make such a mistake again.  The lesson is learned now.

Letter from Yelena Sakk to Judge Pechman (October 7, 2009) at Exhibit A, p. 35.

> I am familiar with charges brought against Alla and I can tell you that she has fully accepted responsibility and trying her best to change her life in a positive ways.

Letter from Vadim Aleksanyan, RN to Judge Pechman (October 12, 2009) at Exhibit A, p. 36.

> It is especially a difficult time for [Alla's son R.S.] when Alla was away for the few months that she spent in prison.  Children can feel the stress and are very sensitive to events in their family's life even though they may not know exactly what is going on.  Although Alla has been home now, [R.S.'s] grandmother drives and picks him up from daycare because of Alla's home detention and I can tell you that other kids pickup on that, they always tell R.S. that they have a mother and a father and R.S. gets picked up by his grandmother, but R.S. always tells them that his mom is waiting for him at home.

Letter from Maryna Mysko to Judge Pechman (October 12, 2009) at Exhibit A, p. 38.

> We all make mistakes and sometimes forget right from wrong, but knowing the kind of person Alla is I know she can move on and improve her life going forward, she has great support from her mom who she is currently living with and other friends and family who only want to see her succeed in life.  I am positive that Alla will not make the same mistakes again, and has learned a good lesson from this experience.

Letter from Sofya Specktor to Judge Pechman (October 10, 2009) at Exhibit A, p. 41.

Ms. Sobol has directly admitted her culpability and, both by her words and her actions, expressed her sincere remorse.

> When I was at Nationwide, I did originate loans. Many of the loans that I originated were clean and solid loans.  Some were not.  As to the loans with false statements, I knew that what I was doing was wrong.  I regret every day that I made those choices.  I could have done better with my career but I

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 26

Skellenger Bender, PS
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

11911 00101 lk109902

> didn't.  On some loans, I forged documents to get people approved and made false statements to banks when submitting loans.  I did not intend for the banks or for anyone to have losses on these loans, and hoped that the continued run-up in the housing market and the ready ability for anyone to refinance would avoid harm.  But this was naive and wrong.  I know that I was greedy and wanted to make a lot of money.  I still knew that I was breaking the law and I am extremely sorry that I did this.

Letter from Alla Sobol to Judge Pechman (November 20, 2009) at p. 6.

After completing the custodial portion of any sentence imposed by the Court, Alla Sobol plans to build on her current volunteer work as an English as a Second Language (ESL) instructor to new immigrants by obtaining a Masters degree in Social Work.  Ms. Sobol is hopeful that she can make amends for her misconduct by remaking her career as a social worker, helping others:

> After jail time at SeaTac and volunteering, as soon as I am able, I want to apply to the Masters of Social Work program at UW.  I hope to become the person I should have been and to give back to the community and help people who are challenged by language and cultural barriers, poverty and lack of education, including single moms with no support.  I know what it is like when it seems like there is nothing left out there for you and how some positive words or help can change all that around and maybe prevent someone from making the same mistakes that I did.

> I am truly sorry for having engaged in this conduct and I know in my heart that it will never happen again.

Letter from Alla Sobol to Judge Pechman (November 20, 2009) at p. 7.

Under the current sentencing paradigm in federal court, it is ultimately up to the Court to exercise its discretion about the individual human being standing before it, and "recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation," 18 U.S.C. § 3582(a), to determine a sentence that is "sufficient, but not greater than necessary," *Kimbrough* 128 S. Ct. at 570, to achieve the goals of sentencing.  Here, considering Ms. Sobol's history and characteristics, and the circumstances of this offense, it is respectfully suggested that a sentence of three years in prison, as recommended by the probation department, and four years in prison, as recommended by the government, are

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 27

11911 00101 lk109902

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501

sentences that are much greater than necessary to achieve a just sentence. These recommended sentences also fail to reflect a fair sense of proportionality and relative culpability among these various defendants.

DATED this 1st day of December 2009.

SKELLENGER BENDER, P.S.

s/ Peter Offenbecher
WSBA No. 11920
SKELLENGER BENDER, P.S.
1301 – Fifth Avenue, Suite 3401
Seattle, WA 98101-2605
Telephone:  206-623-6501
Fax:  206-447-1973
E-mail:  poffenbecher@skellengerbender.com
Attorneys for Alla Sobol

DEFENDANT ALLA SOBOL'S SENTENCING MEMORANDUM
CASE NO. CR 09-0084 MJP
PAGE – 28
11911 00101 lk109902

**Skellenger Bender, PS**
1301 - Fifth Avenue, Suite 3401
Seattle, Washington 98101-2605
(206) 623-6501